Good morning, may it please the Court. My name is Austin Nemix. I have the privilege of representing several Oregon voters. One of my clients is Mr. Peter O'Brien. Mr. O'Brien is 81 years of age and he's been a registered Oregon voter since 1952. Unfortunately, in January of 2007, Mr. O'Brien suffered a disabling stroke, which, amongst other things, affected his ability to write. But yet, still being an active registered voter of Oregon, he continued to participate in the democratic process. One of the things in which he participated was referendum 303. And yet, in participating in referendum 303, and because his signature changed because of his stroke, his signature was rejected by the Secretary of State. He was provided with no due process and equal protection. And if this Court accepts the State's theory on this case, Mr. O'Brien, amongst other Oregon voters, will be excluded from participating in the democratic process because he suffers from a medical condition. If you're right, every signer of a petition is entitled to have his or her signature compared with the one in the registration of the county registrations records. Judge Gould, I would respectfully disagree with that. What we're asserting the right here is, it is a right to participate in the democratic process that's designed to enter an accurate result. Part of that process involves the State's regulation of that process, which means that certain individuals may have their signatures excluded as the process goes along. One of the things referenced in the briefing here is the sort, where sheets, entire sheets of signatures may be excluded because they do not meet certain administrative requirements. We're not stuck. But that's not the issue here. That's not the point you're making. You're attacking the sampling and the comparison of the signature on the petition with the signature when the person registered to vote. I registered to vote in Oregon in 1943, and the signature's still on file. Probably doesn't look like my signature today. Right, and if you're able to remember what your signature looks like when you registered in 1943, then you get to sign a referendum. But if you don't duplicate what you did in 1943 under the State's current standard, you are prohibited because your signature will be excluded under a standard list system. The State has proffered up, and let me make one statement in answer to your question, Judge Gould. We are not challenging the statistical sampling process. That's not part of the challenge. What we're challenging is the fact that once the sample is drawn, the sample in and of itself is the referendum. Okay, everybody that has not been sampled is now part of the referendum anymore. The sample is the referendum. And when you get down to actually determining whether or not you have sufficient signatures that meet a specific threshold delineated by Oregon law, the obligation of the State is to make sure that the result is accurate. And in order to do that, we believe they should follow the mandates of Oregon law and determine whether or not each signer is actually the person whose name is on the petition. That's not what they're doing. They're using an arbitrary standard that is undefinable. The State has still been unable to define what a match or a no match is. As a matter of fact, in the briefing in this case, what their expert that was first heard in open court on this case as now what the standard is, even though the State's expert admitted that in her training, which was infrequent and non-mandatory, she never talked about what the standard was. There's no mention of what a match or a no match is in any of her materials. As a matter of fact, her materials discuss the notion of genuineness, which is what we say Oregon law requires. Well, it seems to me you have two different points here. One is that the match, no match, is not a valid standard anyway. That's your theory with your client and with Judge Goodwin's signature. And your second argument, which is that if a match, no match is a proper standard, then you ought to be able to show that in various cases it really is your signature. That's part of it, Judge Reinhart. It doubles on due process and equal protection. Even if match versus no match is a valid standard, one of the problems the State has here is they have failed to delineate any standards by which to judge or measure what is a match or a no match. The beauty is literally in the eye of the beholder here. And you have 36 Oregon counties, 36 Oregon clerks, all determining in their own judgment what a match or a non-match is. Well, I don't see anything so strange about that. You know, if the test is properly, is this signature the same as the signature on another piece of paper? It doesn't seem to me it's an unreasonable procedure to have people, they're not all going to see everything the same way, to have people look at signatures and see if they seem to be the same. And then you have a review up through, up to the county register to confirm that. These elections are conducted generally by various county boards, and when you look at ballots to see whether they conform with the intent of the voter, all of those things, they're human decisions. It doesn't seem to be unconstitutional, regardless of Bush versus Gore, which is a unique case, as the Court said. It is a unique case, Judge Reinhart, and one of the reasons that Bush v. Gore is unique, and I think I draw from the Supreme Court's language there, is they wanted delineated standards because they weren't dealing with a person. They were dealing with a piece of paper. And when you take the ballot in Bush v. Gore, there was no way for the elections officials to link that with the specific person who signed it, and so now they need to implement standards to figure out how to deal with it. That's not what we have here. We have even more. We have a signature, which in and of itself is an abstract thing, but we know whose signature that belongs to. And in this instance, through no effort of the State, my clients and several others found out that their signature had been excluded, placed no burden on the State whatsoever, came into the county clerk's office, provided evidence that they were, in fact, the ---- Well, that's what you really ---- that's your true statement, that match-no-match is not enough. Exactly. There ought to be more than match-no-match. It's a fair starting point. I don't deny that. I understand the State has a right to administrate the process. The State does not have to expend all of its resources administrating any particular process. And if it's a starting point, that's fine, but that can't be the end of the query. And even the State's expert admitted during the permanent injunction hearing that something more is required when you are excluding individuals who are actually the signer and producer of that signature, because the State has chosen to use fallible entities. Signatures are fallible. Both experts in this case from both sides confirmed that people cannot robotically reproduce their signature. It just doesn't happen. And as all of us grow older, our signatures deteriorate and the samples are not going to be the same. So when you have a client like mine, Mr. Henry Scott, who last signed his voter registration ---- Who says that your signature deteriorates? I'm sorry, Judge? Who says that your signature deteriorates? Well, as a general rule. Now, yours may be impeccable from day to day. I wouldn't say that's a general rule. I'd say that the younger generation, it's already deteriorating. They get better. They don't teach them how to write anymore. So that's very true. That's the Zaner-Blosser method. Let me ask you this. You take a sampling, right? And then what was it, about 4,000? The sample in this case was 3,033 signatures. Okay, 3,033. All right. Then they went through that sampling and out of that there were questionable a little over 100 signatures, right? There were 254 that were excluded. There were 55 excluded under the match-no-match standard. Okay. So you were short on your signatures to get whatever the percentage was just by what, 100? Five. 105? No, five. Five? Five sampled signatures short of qualifying the referendum for the ballot. Yes, sir. Five sampled signatures short. So I thought one of your arguments was that the folks whose signatures were rejected, a small number ought to be notified and be able to come in and say, yeah, that is my signature. Isn't that your argument? That's exactly right, Judge, because we're not talking about a statewide election here involving millions of voters. This referendum to sustain required a little over 55,000 signatures. And so we're not talking about a burden. In fact, the number of signatures we're dealing with, 55, you divide that amongst the 36 Oregon counties. I realize it doesn't divide out equally, but the average here is less than two a county. We're not talking about an extraordinary burden on the state. And this is something the state already does with voters by mail. They have the procedures in place. They have the vote-by-mail manual. That's a lot more reliable than people not connected with the state going out on the street who have historically engaged in fraud and are eager to make money by getting signatures. There's really no comparison between the two processes. Well, in terms of affording different Let me ask you this. You know, the general practice in initiatives and referenda throughout the country is you need a substantial number of signatures, more than the ultimate number, because historically a large percentage or substantial percentage have always been found to be invalid. This whole process is one of approximation, isn't it? You start with a sample, and then you disqualify some, some which may be right, some which may be wrong, and you qualify some, some of which may be right and some of which may be wrong. In fact, the testimony showed that if you'd really reviewed everything thoroughly, there would have been more disqualified among the ones that were accepted, and you would have been even farther short. Isn't this whole process sort of starting with the sampling, a way to try to get an approximation, which may work to your advantage, even though you're some short after the sampling? You may be ahead of where you really should have been had they reviewed both of them as carefully. Well, Judge Reinhart, I respectfully submit that the process and the insurance policy would have been to obtain a few more signatures. Well, the proponents did, Judge Ferguson. They obtained 62,000 signatures is what they remitted to the Secretary of State. And how many were required to qualify? A little over 55,000. So they obtained an extra 10 plus percent. And so they did do that as a matter of practice, but it doesn't change what the threshold is. And the threshold is 4 percent of the electorate in the last gubernatorial election. And that number is not a moving target. And so while it may be easier to qualify a referendum by having a whole bunch more or twice as many, it doesn't change the standard under Oregon law. And whether it's a small number submitted or you have a huge overflow, I would respectfully submit it is irrelevant to the inquiry. What we're dealing with is whether or not this referendum process in Oregon really is something of the level of a fundamental right, whether the Santa Rosa case of this court really means what it says, that we're dealing with something that is an indestructible part of democracy. I just, having written that opinion, I don't think there's any question it's a fundamental right. But then you get on to how you can limit it. Is it where the state can adopt regulations to ensure the legitimacy of the process and verification procedures? And there you have to move on the Crawford, which of course was decided after your briefs were filed, and Burdick. And they give you a very practical test about what's the state's interest, and is this a reasonable way to validate that interest. And that's really what you come down to in this case. Certainly the state clearly has an interest in making sure that the signatures are legitimate. They have an interest in combating fraud, in protecting the process. And then you have to weigh that against the way the state does it and see whether that seems to be a reasonable way to do it. That's correct. And the trial judge did do that, Judge Reinhart, and he made a factual finding that the process that was being requested by the plaintiffs was not overly burdensome and would not place a burden upon the state, and was reasonable under the circumstances. And the state didn't appeal that decision. So it's our position on appeal that that is the law of the case. Now, that may be reasonable, but he didn't say that the state's method was unreasonable. He said the state's method was not terribly desirable. Maybe they'd like to make some improvements. But he didn't find that that was not a reasonable method also. Well, one additional thing he found, though, Judge Reinhart, is that no process can never satisfy the requirements of due process. And there is no process involved in what the state has right now. And if it is a fundamental right, which we believe it is, then there has to be some level of due process, because you cannot You know, here it's really an odd circumstance, because it's not really an individual voter being disqualified. What you're disqualifying is a whole group. It's part of a process. When one person's disqualified, 20 are disqualified. So you're disqualifying a group, really not the individual. He's no more different from the whole batch. And in this kind of a case, it happens in many circumstances. I mean, you sign a petition, and there are errors by the petition circulator, and your whole sheet's gone, including all these people who have a right to sign a petition. So it's sort of a group process, and it's a sample, and it's an approximation. And you're disqualifying one group on the basis that there's a question about signatures. Having somebody come down and say, that's my signature, doesn't mean it really signed it before. You have to have an entire inquiry into all the ones that are disqualified. Or can you say, look, we disqualify them. We don't think it is, but it's really balanced off in this process by the fact that we've qualified a lot who also may not be. Everything's an approximation in this kind of a process, which may or may not be the best way, but the question is, is it an acceptable way? Well, everything you're talking about, Judge Reinhart, with regard to removing sheets and the sort and the statistical sampling, it's all administrative. None of that is getting down to the substance of the question, is whether or not there are enough signatures to sustain the referendum. And that's what we're talking about here is the nuts and bolts of it. Once we get down to that, and the State is required by law to determine whether or not there are enough signatures of registered voters, not signatures like registered voters or similar thereto, signatures of registered voters, they have a duty, because it's a fundamental right, to make sure they get it right. But they don't do it on the other side. They don't do it to see when you qualify. They have less of a judgment to see whether the good signatures are good. They don't apply that same fundamental right to protect the integrity by doing more than having one person look at it and see if it matches. Well, they absolutely could if they wanted to. Well, they could, but the question is if they don't do that. And, in fact, you have a better system on your side. You have not only the original decision, but you've got all the reviews up the way, up the line, until there's a supervisor, a county clerk. You need that whole group to do it, whereas, on the other side, you get credit for signatures just on the match-no-match. I don't believe that's correct, and let me explain why. Because that's the expert reviewing signatures under a match-no-match standard. She's not making a determination that the people on that referendum didn't sign it. And so it's a fictitious analysis. She's sitting there reviewing signatures saying, oh, I don't think this one's a match, or I do. I'm talking about the expert now. I'm talking about the process that you get the credit for signatures that aren't subjected even to the same level of scrutiny. Oh, you're talking, okay, in the sampling process. Well, I mean, that's the State chose to implement a Stanley process to ease its burden, okay? So that inerrs. I don't think it makes things better. I don't think people get credit. If anything, it requires the State to exact a greater level of scrutiny on each individual signature because the consequences of either accepting or rejecting that signature are so much more grave. Each one counts 20 because of the sampling. So I don't think it makes it better for the voters. I don't know that we're connecting, but what I'm saying is you got credit for X percent of the signatures without even the same level of scrutiny that was applied to the ones you're complaining about. Whatever the expert said, and that happened to validate it, but the States adopted an approximation which works to your benefit because there's no review once somebody makes a match, no match, and says it's a valid signature. When they say it's invalid, you have a whole level of review. You're 96 percent of the way there. You present all these pieces of paper with the signatures and say, all right, 96 percent. They're okay. Now let's look at the next 4 percent. It all goes out, and all you really have to do is get more signatures. There is a remedy provided under Oregon law for any person adversely affected, which means if somebody doesn't like the determination of the Secretary of State, they can bring a remedy under State law. So there is a flip side to that coin I would respectfully submit, and I'd like to reserve my balance of time for rebuttal. But, you know, as Judge Reinhart pointed out, there has been, the experience has been when you have people running around and they get a dollar a signature, two dollars a signature, that there is a temptation to write names in there. And then you also have the problem of someone coming out of a supermarket with bags of groceries and they're stopped for a second or accosted and said, well, do you believe in equality? Oh, yeah. Well, if you do, sign here. And so they really don't know what they're signing. My time has expired. May I respond, Judge? Yeah. That is something that the State talked about at the trial of this case, although there is no evidence in this record whatsoever that there was any fraud in this referendum whatsoever. No, no. What Judge Reinhart was telling you is this is why the State sets up this approximation to kind of ease it, because in the final analysis, if it's a referendum, it's going to go to a vote. And that would clean it up. Yeah. I understand. Okay. May it please the Court, Kay McDonald representing the Secretary of State. Quite honestly, Your Honors, the remarks that the judges have made make it clear to me that you understand what we're trying to say, I think. Basically, to the extent that plaintiffs are making a due process claim. Put the microphone a little closer. Oh, thank you. Just the top of it, you know. Yes. Is that better? Sure. Yes. To the extent that there's a due process argument being made, as we pointed out in the brief, the real question is, what has the State, through its Constitution and through its statute, promised people who are signing referendum or initiative ballot signatures? And the answer to that is, well, you have to look at the Constitution, which permits the legislature to make rules about how you verify signatures. And those rules themselves say the Secretary of State may make rules to implement how to verify signatures. It's got to be reasonable. Yes, it does have to be reasonable. And how reasonable it has to be, and if there's an easy, better way to do it, is it still reasonable? Those are the questions. You know, it seems to me we're really not judging much of a legal question here. It's judging the specific procedures and whether they can't interfere, basically, with the rights. You can adopt regulations, certainly, controlling the voting process, and you've got to justify the regulations. Yes, I agree with that, Your Honor. And, I mean, obviously people do have a right to sign their names and become part of this collective joint venture, as it would be, to challenge something and its place as to whether it should be on the ballot or not. I mean, that's clearly a right that they have. So if we follow your train of thought, is it reasonable for the legislature to have said, and the way that we're going to do this is to make sure that we have the right number of votes and that we do have the people signing who are actually registered voters and who they are, who they say they are, is to do a very simple thing, compare their signatures with their voter's registration card. We tell them that on the petition. We say, put your signature down as it is on the voter's registration card. And, of course, as chief petitioners have an interest in getting enough circulate. I have no idea, for instance, when I go in to vote and they tell me to sign it, I don't know, remember whether I used my middle initial, my middle name. But I gather under your regulation that you do count them even if they don't use the middle name. Yes. This is not a difficult or taxing match.  And, in fact, I would invite the Court to look at the examples that plaintiffs have cited as ones in which, well, gee, we both we signed twice, but one of them was accepted and one of them wasn't. If you will examine those signatures, the reason is because one is clearly like two printed out names, which doesn't qualify at all, and the printed out name is completely different from the cursive name. What's your answer to the example of the plaintiff who's 81 years old or whatever he is and has had illnesses and can't write the same way? I have three answers. One, everybody can always renew their voter's registration card. So if he has a different signature, he can certainly change that. Two, and that's not my best argument. No. Two, the interest that you have, I mean, two is that this, as you said, Your Honor, is an approximate process, and it is entirely possible that there are going to be errors made. And it does happen. And Mr. O'Brien may be one of those errors. But the Supreme Court has made it very clear that a state elections division doesn't have to change its entire process because of a mistake. And three, the only right that you have is that to sign your signature. When he signs his signature, he is assured of the fact that he has no better than one in 20 chance of having it counted. This is an approximate kind of process. I mean, of having it sampled. I'm sorry? Of having it sampled. Yes. I mean, it will be counted. No. His chances are 80%. Well, his chances of having it verified so that it constitutes a statistical body of votes is essentially one in 20. So, I mean, when you go into the process, you know that your signature is not necessarily going to end up in the vast scheme of things counting. But my only point there, Your Honor, is that the interest involved is very many. Well, I thought they all counted unless you go unless you're part of the sample and then the sample shows that there aren't enough. But the rest of them, the other 80% or whatever they are, are counted. They are counted. That's correct. I'm only talking about the verification process. All right. So his is going to be counted unless he ends up in the sample. It won't be looked at. Correct. Okay. Correct. So 80% passed the sampling test. Is that what you're saying? I'm not suggested to. What the Secretary does? I'm sorry. Pardon me? Well, what percent passed the test, the matching test? Oh, the way that it works is that the Secretary takes 5% of all of those signatures that have already been ñ I mean, the signature sheets are okay and they've been signed off and everything. They pull one in 20 to look at. Right. They pull one in 20 to look at. Correct. Okay. And then out of the one in 20, what's the percentage of those that get put in the no-good pile? Well, in this case, it completely varies from petition to petition. But it's important to note that, you know, this is a very time-constrained process. What percentage in this case were disqualified? What percent? If the sample was disqualified. I'm sorry. I'm not understanding your question. I beg your pardon. Out of the sample, the 5%. Yes. You counted, what, 3,000, 4,000? Oh, correct. And what percentage were disqualified? I have to figure it out. It was 200-something, I believe, in total, 55 because of the signatures not matching. Fifty-five out of, what, 3,000 or 4,000? Between 3,000 and 4,000. Those are the verified signatures. Okay. So it's about maybe 3%. Do you know what the general rate runs on disqualification for signatures? The general rate. I want to back up because there were five signatures at issue here. I'm sorry. Pardon me? But 55 were disqualified because of the no match. I believe so. And that we've ---- And only five of those have been challenged. Oh. Mm-hmm. Is that a general ---- Is that representative of what usually happens in referendum initiatives? It really varies. And I think as plaintiffs' statistics show, it varies from county to county and election to election. And there is a very significant problem with fraud in Oregon, unfortunately, in these petitions. And so you can have one county or one particular election that draws a great deal more problems in that regard than others. So I can't give you, you know ---- All right. Go ahead. I'm sorry. Go ahead with your argument. Well, I wanted to get back to your reasonableness discussion because this is a very efficient, reasonable, and fair way to do that approximation. And it's important to recognize that the purpose of having a referendum, after all, is not to create a disruption in the political process, but rather to essentially take those issues that people want to make sure are okay, that the issues and measures that the legislature has promulgated, and get, you know, get any questions taken care of so that we can have a smooth procedure. It's not really a ---- It's not the same thing as voting in the sense that it's really an intermediate step. Yes, it is important. Yes, it certainly has ---- implicates some fundamental rights. But, again, the question is, is it a reasonable way to go about this, to determine whether they're authentic and to determine whether they're enough? And there's a lot of ---- Well, they say allowing the people to come in and persuade you that that is their signature. Yes, and that isn't a better answer for a couple of reasons. One is that it skews the process because it's already a process which is weighted in favor of allowing a petition to go to the referendum and go to the people. And, second, it creates all kinds of problems. And we pointed some of those out in our brief. You have a situation where you ---- verification takes several minutes. This isn't simply a quick, easy read-out on the voter screen like it is with vote by mail. It takes several minutes to do that process. It adds time to the process. If somebody does challenge ---- Well, you had 55 people whose signatures didn't match. Pardon? I said if you had 55 people whose signatures didn't match, it wouldn't be a tremendous burden to call them in. It wouldn't be so time-consuming. Actually, it would cause a lot of problems, Your Honor, because, first of all, there's no guarantee that you can get all of those people. They may have moved or it may be difficult to locate them. No, no. All you have to do is send them a notice whether they come in or not. It's up to them. That's true, perhaps. But the greater issue is that this is one relatively confined referendum in a process that extends beyond that. We often have 10 to 20 initiative petitions per year. It creates a huge burden on the secretary to have to call people in. And, you know, what if the people come in and then there's an argument about whether they really did sign it or not? Then what do you do? It could draw out to the point where it's- Then you make a decision. Well, it sort of defeats the whole- Which- What you're saying is it defeats the process because you've already let 95% of them through with a pass. Exactly. And it defeats the process because we're trying to find a really efficient, fair, evenly applied standard, and that's the standard. Does any other state do it this way? Does California do it this way? In the sense of verifying signatures by registration? Yeah. I don't know, Your Honor. I'm sorry. I know that there are a lot of variations on the theme. Some states require a greater percentage or a lesser percentage. No, without verifying signatures. In terms of just do you match the voter registration card? Yes. I don't know whether they do. I know that it's the- California, for instance, verifies signatures, and they disqualify a fair number, but I don't know on what basis. Would tests they apply or- I certainly don't have any right to come in and challenge it, but I don't know what the process is. You don't know- I don't. In California, I'm not aware. I think we've had cases where the- whoever does it, the Secretary of State, has certified the validity of hundreds of thousands of signatures in a process that took two days. How they did it, I don't know. I don't know how they would do that either, honestly. Typically, the sampling process takes two to three weeks. There are a number of steps that have to happen after a petition qualifies. The verification process itself takes a goodly number. Again, it's split up between counties. But that was not a referendum. It was a recall. Right. Okay. But at any rate, it's, I think, unrealistic to look at this case strictly as one single referendum, and that's all the Secretary has to do that term. It's a very wide process. Okay. Thank you very much. Your Honor, this is our intervener, Margaret Olney, and I'll let her have some remarks.  Thank you, Your Honor. Margaret Olney for Basic Rights Oregon. And I think I can answer some of your questions as frequent participants in this process and this council who represents many of the players. In this case, the number of signatures that were submitted in this referendum was they needed a validity rate of 89% in order to have the measure qualify. That is an extraordinarily low number. If you look at the exhibit supplemental ER pages 6 through 16 or 18, there is a summary chart of all of the initiative and referenda that have been submitted in Oregon in the past, I believe it's eight years, that shows the relative validity rates that petitioners have gotten. In unpaid, where you have paid circulators, about the best that has ever come is an 85% validity rate. When there's, excuse me, when it's all volunteer. When it's all volunteer, the validity rate, the best has been about 85%. The typical validity rate in paid signature gathering campaigns is on the order of between 65% and 72%. So it is absolutely true that chief petitioners, that proponents for Referendum 303 knew ahead of time there is known rules of the game and that in order to qualify, you need to have a cushion. And they simply failed to get it here. And the people who suffered were the families in Oregon that were unable to get the benefit of the domestic partnership law for a period of time. They now have it. There are other procedures for opponents of domestic partnerships to go through. They failed to do that through the initiative process. They cannot resurrect the Referendum 303 simply by asking for new rules here. There were also a couple of questions from the court regarding the practices in other states. And in Intervenors' response, we included an article that summarizes the signature verification laws from other states. And we also outlined those. For throughout the Ninth Circuit, all states generally have a match-no-match process. And there are no additional rules describing what that match-no-match process is, but they all compare a signature on the petition sheet to a signature on the voter registration file. So that is the accepted process that is done, I think, probably close to universally. There are- These are in the exhibits to your brief? It's an appendix to the brief. Yes. So it's at the end. There's an organizational call, the INR Institute. I see the exhibit. So that is a summary generally of what the practices are. There are, in my looking at this, there are a handful of states that may provide for some kind of hearing to determine whether or not a signature is valid. Those are very few and far between, if you look at the process here. There are variations on the theme about samples. Some-most states in the Ninth Circuit use a sampling technique. In some, where the margin of error is sufficiently close, then they look at all signatures. Again, that is an objective, constrained review of the signatures, only on a comparison of the sheets to the voter registration files, and not an invitation to everybody to say whether or not this is my signature. One of the problems in plaintiff's case, and one of the reasons why- I mean, this is not a perfect system. There are plenty of signatures they get through that are fraudulent. And if an individual has a right to prove that their signature is genuine, so too should an individual whose signature is counted as valid have the right to show that it's fraudulent. This would mean that everybody's signature that is in the sample would get notice of the results of the review, and would be entitled to come in and show whether or not it is quote-unquote genuine. There are times when I think my clients would appreciate being able to do that, because we know that there's forgery in the system. But this is a system that is imperfect, but it does represent a method that is known that has- in order to demonstrate enough popular support to place something on the ballot, it does not require the level of precision, and nor is there any individual due process right in this that plaintiffs allege. The record on ER 826, 827 is a good example of where the signatures- one was accepted and one wasn't, and that's because the signatures themselves- it's not initial deleted, it's something that's printed versus a cursive. Finally, I'd note that the plaintiffs would have the court believe that the only reason that signatures are rejected is because- that a signature is invalid is because somebody's scrutinizing it too much or- but really, again, as this court has recognized, fraud is a serious problem. So if signatures are rejected, it is not simply because somebody didn't sign closely enough because they're 81 years old, but it may also be because of fraud. And that's how the system is set up. We do not need to prove that there was fraud in this particular referendum for the court to recognize that the process that's being challenged here that has an application for initiative and referenda, that it is designed to both ensure that initiatives can get on the ballot, and there's plenty of ways for that to happen, and at the same time protect against the rampant fraud in the system. Is there any other questions? Then I'll sit down. Thank you. Well, 81 is a young age, you know. You're looking at two guys that were born in 23. Ted? Yes. We're still here. And we still know how to write. All right. Yeah. What year were you born in? 1973. When? 73? Yes, sir. 73. Young fellow. Get up there. Thank you very much. I think the state has allowed this court to develop a fundamental misunderstanding about the sampling process, and I want to clarify that real quickly. When the sample is drawn, the 80% who are not sampled are not counted. They are removed permanently from the referendum. The 20% who are sampled then have their signature, the determination on their signature, count fivefold. So this system is not geared towards automatic inclusion of 80% at the outset. That's not how this works. Each signature that's sampled becomes like a super signature because the weight of the determination on that signature counts five times. How does this violate equal protection or due process? It violates both of them in many ways. The biggest equal protection violation is in the complete absence of any standards to guide the clerks in determining what should happen. The Secretary of State made it discretionary for the clerks to re-review any determination. Go ahead. The clerks are not required to undergo any level of training. They offer this sporadic training, but it's not mandatory. As a matter of fact, we point out in our brief that the legislature, realizing what happened after the hearing, introduced a bill to make it mandatory. And you don't have any standards. When you have a determination, oh, I don't think this signature matches, what happens in the clerk's office, as it's been explained, is they ask another non-signature expert whether they think it matches, and they ask another one. And you have this compounding without any standards whatsoever, which is exactly what the Supreme Court thought was problematic in Bush v. Gore. I don't quite understand what you're saying. I don't disbelieve you, but you mean that the other 80 percent, you said they're thrown away, they don't count, you mean those people who signed the referendum have had their rights violated because their signatures don't mean anything? I don't think their rights are violated, Judge Reinhart. I think they're participating in a process which is supposed to be geared towards an accurate result, and you undertake the risk of knowing, hey, you may not be sampled. That's part of the deal. But those people have a right to have the signature verification process turn out accurately. Everybody in the State has that right to be accurate. Everyone has the same interest. But you're saying that when you sign a petition, it means nothing. Your 80 percent or whatever it is doesn't count anymore. Well, that's the conclusion. This was a fundamental right to have it counted. That's the conclusion the district court drew, was that this constitutional right bore no rights whatsoever to gather equal protection in due process. Well, I think that's not the way I'd look at sampling. I'd say that if you pass the sampling, then those votes do count. Well, I think that there are various ways to look at it, but the consequences are clear. When the sample is drawn, each determination on each signature counts five times. And I think that even places the burden on the State to make it higher. If they're going to use sampling to make their job easier, they have a duty to make sure they get it right. They need to scrutinize. That's why both experts said something more is required when you're dealing with signatures and non-handwriting experts. But the ones just looking at the sampling, the ones that pass the sampling, don't have the same level of scrutiny that the ones that are disqualified do. You have a better deal than the ones that are disqualified. Well, I think the standards should be the same for all of them, Judge Reinhart. I think that every signature should be scrutinized with the same process and the same level of scrutiny. I think that every one should be scrutinized. I'm talking about every one within the sample. In this particular case, all 3,033 signatures should have been scrutinized with the same level of scrutiny under a system that has specifically delineated standards and includes due process for those individuals whose signatures are excluded. Because the consequences of excluding any one signature counts five times. And that affects everybody. And so this right that's inert in the Constitution, which the people of Oregon reserve them to themselves, when it gets down to it, everybody has a right to make sure that the State gets it right. And the way you get it right is by contacting the person, if you have a question about it, and finding out whether or not they really signed it. That satisfies the State's interest and concerns about fraud as well. And it's not a hard thing to do. They do it already with vote by mail. So you would suggest that you have to contact everybody in the sample, not just the ones who are disqualified. No, sir. Well, why not? I mean, what about the ones whose signatures have been forged and they don't see it by this match-no-match thing that you consider inadequate? Well, that's redressed with the remedy provided by the Oregon legislature, that any person who is adversely affected can bring an action and have a review of any determination made by the Secretary of State. Well, why don't you have that same remedy? So we do have the right, but the problem is that we tried to exercise it and we were told no. My clients were not given any redress whatsoever. I don't understand. You say the State legislature provided a remedy, and now you say it didn't. So there is a remedy under Section 246.910 of the Oregon Code that says any person adversely affected by any determination by the Secretary of State can bring an action. The problem is that other people don't have constitutional rights in somebody else's signature. The people who have constitutional rights have constitutional rights in their own right. Okay? Nobody else brought an action in this case except my clients. So, I mean, and I assume what you're getting at here is that what the State is suggesting is that there needs to be some type of start-over situation here, that if this Court rules in our favor. I may be wrong off where you're going with this. But if the Court rules in our favor that the Court needs to send it back and we need to take a new sample and start all over again. No, I was just talking about the process, really. That if the process is unfair to the side that gets disqualified and to those people, it's even more unfair to the people whose signatures are counted because they don't have the same level of review. Well, but there's no constitutional harm. If their signatures are counted, then... There is a harm. They didn't want to sign it. Oh, you're suggesting somebody who signed it who didn't, or somebody whose signature was counted but it was fraudulently placed on the panel. They pass these signatures with less scrutiny than they disqualify the others. So to the extent that there could be errors both ways, you get the benefit. Well, that would be giving somebody who fraudulently created somebody's signature too much credit for actually doing a good job and taking away constitutional rights from somebody else. They don't even look at those in the 80. I'm talking about the sample. In the sample, the ones that pass, the witnesses said, right or wrong, that there were more errors in passing than there were in disqualifying. No, sir. The State's expert testified that in reviewing the signatures under this arbitrary standard, she would have excluded some that the State accepted and vice versa, that her determination would have been different, which I think underscores our point here. But I thought that the professor analyzed the numbers and said that you would have lost by even more. Based on her review under the arbitrary standard. So you take this arbitrary standard that she would have come up with a different conclusion than somebody else, and then you extrapolate it out and you come up with a different conclusion. And we could have done that ten times and showed you ten different results because everybody's going to look at it differently because there's no standard. Nobody knows what a match or a no match is, and there's no standards by which to define it. Every clerk is coming up with a different determination. They have to make the decision on what it is, and there's no guidelines to help them whatsoever. And the statistics prove it. The statistics that were ignored by the district court, when we introduced the evidence of what happened in 2006, there were 13 petitions. Kennedy. Let's say there's going to be a certain margin of error both ways. And the margin of error on the – in your favor is greater than the margin of error against you, partly because there's only one review of the ones in your favor and the whole administrative process of review for the ones that are against you. Well, I understand what you're saying, Judge Reinhart, with regard to the arbitrary review. Our position is this. If the State would have done what it's called to do under State law and made sure that each signature belonged to that person, I think it would have all come out much vastly greater in our favor than what the State has concluded. The question is how much do they have to do to do that? As they say there, if they really made the kind of review you would like, that would really mean taking each one of these initiative measures and going to everybody in the sample and saying, look, you've been counted or you haven't been counted. And is that really true or isn't it true? And then conducting an administrative hearing in each case. Well, I don't think so because if it's been counted, again, there's not a constitutional harm. But notice can be provided. Well, sure there is if someone's signature could have been forged and their name is shown as support for a certain proposition. Well, that's true. But the fraud traditionally in Oregon, and the State went to great lengths to talk about this, had to do with circulators. There's not a tremendous level of fraud in people forging other people's signatures on referendums and there's no evidence of that in this record. And so the State is using that as a red herring. They've addressed the circulator fraud by excluding or making it more difficult to use paid circulators. That's the fraud that has been traditional in this State with regard to referendum petitions. It's not massive amounts of referendum sheets with lots of forged signatures on it. That's not what we're talking about. We're talking about a very small issue that doesn't exist in this case. Okay? It doesn't exist here. What does exist are tons of Oregon voters. Sorry, tons. Excuse me. I don't want to overstate the point. But I've got 30-some-odd clients and we have 55 Oregon voters who signed a referendum and had their signatures excluded for no other reason than the Secretary of State or the county clerks couldn't match their authentic signature with a voter registration card that they executed anywhere from 2 to 40 years ago. That standard in and of itself I think is unconstitutional. It requires the minimum levels of due process and equal protection. Then you have the benefit of the way it was done where the 80 percent just go, you know, they get a pass. Well, they don't get a pass. Their signatures are not scrutinized at all and they're not counted either. They're removed by the sampling process. So, again, not to beat a dead horse, but every sampled signature is worth five, which means the state has got to get it right because the consequences of not meaning that you're excluding five people. So what's really challenging is the approximation process. Not necessarily. We don't think it's unconstitutional. Not the sample, but the approximation. You're not challenging the sample, but you're saying that there's not enough accuracy in the fact that there are going to be mistakes on both sides during the sample. You're saying there shouldn't be those mistakes. So I don't think there should be because the state has chosen to use sampling. I don't think an approximation process at the end of it is appropriate. Do you know of any state that uses additional procedures to this? I know that there are states in the Ninth Circuit that have some levels of due process, and I believe that the state of Washington is one of those, but please don't hold me to that. But I know that there are some in the Ninth Circuit, and I think Ms. Olding was correct, that don't provide due process. It's just right across the river here, right? Yes, sir. You don't know what's going on even over there? You're giving me way too much credit, Judge. I'm sorry. So I can go over there and find out and come back and let you know. No, no, don't do that. Thank you for your time. See you. This Court, this session is adjourned and will recess until tomorrow morning at 9 a.m.
judges: Goodwin, Pregerson, Reinhardt